# LULU L. WAGONER, Appellant, v. GEORGE C. R. WAGONER.

## Division One, April 9, 1921.

1. **ADDITIONAL ABSTRACT.** Where appellant filed her abstract thirty days before the case was for hearing on the docket, an additional abstract filed by respondent two days before said docket date is barred from consideration by Rule 11. Nor can it be considered if no part of the record as a bill of exceptions.

2. **FRAUDULENT JUDGMENT.** Relief from a judgment obtained by fraud may be had in equity, and a judgment so obtained constitutes a defense in law, and no judgment so obtained can be made the basis of a recovery.

3. **DIVORCE:** Vacation of Judgment for Maintenance. A fraudulent decree of divorce entered in a Nevada court did not *ipso facto* vacate, as of its date, a decree for separate maintenance in favor of the wife previously entered in a circuit court of this State.

4. ————: ————: **Fraud.** A citizen of Missouri cannot, without cause, desert his wife, and without her knowledge or consent go to a distant state, in which he was never domiciled, and there procure a divorce in her absence which will *ipso facto* vacate a former judgment in her favor for maintenance in a Missouri court in which was adjudicated the same facts against him.

5. ————: **Jurisdiction.** The person whose matrimonial status is affected by a judgment for divorce must be in the jurisdiction where it exists. A citizen of this State does not take with him the interest of his wife in the marriage status, so as to subject it to the jurisdiction of any foreign court which he may find subservient to his purpose to get rid of her. The change of the domicile of the husband, who deserts his wife and goes to another state for the purpose of obtaining a divorce from her, does not draw after it the domicile of the wife.

6. ————: ————: **Judgment for Maintenance.** A decree of a wife residing in Missouri, against her husband for separate maintenance, fixed her matrimonial status separate from his, and when he wrongfully went into another state for the purpose of avoiding his marital obligations such other state did not become her matrimonial domicile, either actual or constructive; and he could not carry her separate matrimonial status to such other state and

there use it to give jurisdiction to a court of that state to set aside a judgment of a Missouri court which had fixed it.

7. ———: ———: ———: **Wife's Domicile Following That of Husband.** Ordinarily the matrimonial domicile of the wife follows that of the husband; but when the matrimonial unity is destroyed by a decree of court founded upon his misconduct, or is wrongfully repudiated by him, her matrimonial domicile remains in the state of her residence, and the court of a foreign state into which he has gone for the sole purpose of obtaining à divorce from her does not so acquire jurisdiction as to destroy her separate matrimonial status fixed by the decree of the Missouri court. In such case, the court of the foreign state does not obtain jurisdiction of the *res*—her separate matrimonial status—and whatever may be the effect on his rights and duties of its decree granting him a divorce, it is void in all things relating to her matrimonial status, and does not affect her rights under a former decree of a Missouri court adjudging her entitled to an allowance for separate maintenance, for such decree established her innocence of wrong in the matrimonial relation and her further right to be his wife wherever she might lawfully be.

8. ———: **Jurisdiction of Foreign Court: Fraud.** The presence of the husband's own matrimonial status in the foreign state to which he had gone for the purpose of obtaining a divorce being jurisdictional, fraud in obtaining a matrimonial status there would go to the very foundation of the jurisdiction of its court to grant him a decree; and where his acts show that he dismissed his suit for divorce pending in a Missouri court for the purpose of seeking a more kindly jurisdiction in another state, and thereby vacated the order for alimony *pendente lite* so as to leave her without means to follow him, and secured a judicial welcome in the other state by engaging board at two hundred dollars per month at a hotel and hiring out as an ornamental clerk at a store for seventy-five dollars per month, it is manifest that he induced the court in the foreign state by actual fraud to assume jurisdiction of his suit for divorce.

9. **JURISDICTION: Service of Process.** Where the husband and wife had for years occupied a certain property as a home, and after he had brought suit for divorce the fraudulently induced her as a part consideration for an allowance of suit money to leave said residence, a service of process on a maid in said home, in her suit for a separate maintenance allowance, brought after he had dismissed his suit for divorce, the said maid and his mother being the only members of his family, is a valid service, and brought him into court, although he was not in the State at the time.

Appeal from St. Louis City Circuit Court.—*Hon. Vital W. Garesche,* Judge.

REVERSED.

*Wm. B.* and *Ford W. Thompson* and *Randolph Laughlin* for appellant.

(1) Past due installments of a judgment for future maintenance are within the protection of the full faith and credit clause of the Federal Constitution. Sistare v. Sistare, 218 U. S. 26. (2) The judgment in favor of Mrs. Wagoner operated to cause an indebtedness to arise in her favor as each installment of maintenance fell due, and the circuit court's power to modify could not operate retroactively on past due installments. Sistare v. Sistare, 218 U. S. 13; Barber v. Barber, 21 How. 582; Livingston v. Livingston, 173 N. Y. 377; Goodsell v. Goodsell, 82 N. Y. App. Div. 70; Cotter v. Cotter, 225 Fed. 475. (3) The maintenance judgment is an obligation of "the most binding force," and "for its payment no property of the husband is exempt." Pickel v. Pickel, 243 Mo. 663. (4) Such obligation is a property right, and constitutes "property" within the meaning of the Fourteenth Amendment. Dorrance v. Dorrance, 242 Mo. 625. (5) The Reno decree deprives appellant of her property, within the meaning of the Fourteenth Amendment. Dorrance v. Dorrance, 242 Mo. 625. (6) Where, as in this case, the due process protection of the Fourteenth Amendment is invoked, the decisions of the U. S. Supreme Court are controlling. Atherton v. Atherton, 181 U. S. 170; Huntington v. Attrill, 146 U. S. 657. (7) And a constitutional question is involved, which confers jurisdiction on this court. Dorrance v. Dorrance, 242 Mo. 625. (8) The Reno decree is void for six separate reasons, viz.: (a) There was no matrimonial domicile in Nevada, and therefore the *res*—the marriage status—never was within the judicial power of the Nevada court. (b) Wagoner him-

self had no bona-fide domicile in Nevada. (c) Independent of the above, no jurisdiction was acquired under the Nevada law. (d) The Missouri decree is prior in time, and is therefore controlling. (e) The Reno decree was obtained by fraud, and was part of a scheme and purpose to defraud appellant of her marital rights. (f) The Federal court's decision that the Reno decree was void is *res adjudicata* of its invalidity. (9) "The courts of the state of the domicile of the parties doubtless have jurisdiction to decree a divorce in accordance with its laws, for any cause allowed by those laws, without regard to the place of the marriage, or to that of the commission of the offense for which the divorce is granted; and a divorce so obtained is valid everywhere." Cheely v. Clayton, 110 U. S. 705; Atherton v. Atherton, 181 U. S. 155; Haddock v. Haddock, 201 U. S. 562, 586, 587-604. (10) "If a wife is living apart from her husband without sufficient cause, his domicile is in law her domicile; and, in the absence of any proof of fraud or misconduct on his part, a divorce obtained by him in the State of his domicile, after reasonable notice to her, either by personal service or by publication, in accordance with its laws, is valid, although she never in fact resided in that State." Cheely v. Clayton, 110 U. S. 705; Atherton v. Atherton, 181 U. S. 164; Gould v. Crow, 57 Mo. 200; Anthony v. Rice, 110 Mo. 223; Howard v. Strode, 242 Mo. 210; Blass v. Blass, 194 Mo. App. 624; Burlen v. Shannon, 115 Mass. 438; Hunt v. Hunt, 72 N. Y. 218. (11) But where a wife is living apart from her husband with sufficient cause, as where the matrimonial domicile is in a particular state, and "the husband abandons his wife and goes into another State in order to avoid his marital obligations, such other State to which the husband has wrongfully fled does not, in the nature of things, become a new domicile of matrimony, and therefore is not to be treated as the actual or constructive domicile of the wife." Haddock v. Haddock, 201 U. S. 570; Barber v. Barber, 62 U. S. 594; Parker v. Parker, 222 Fed. 190.

(12)  In this case, the Reno court acquired no juris-
diction of the *res*—the marriage status—in that the
parties never did live together as husband and wife in
Nevada, and   (a)  The husband had wrongfully aban-
doned his wife before he went to Nevada, and had there-
by lost his right to have the matrimonial domicile follow
his own domicile.   Barber v. Barber, 62 U. S. 594.
(b)  He never made any effort to exercise such right,
if he had any, in that he never made any bona-fide (or
other) attempt to induce his wife to follow him, or to
translate the marriage status to Nevada soil.   Parker
v. Parker, 222 Fed. 191.   (13)  The matrimonial domi-
cile, therefore, remained rooted in Missouri.   It follows
that the Nevada Court never had the *res* within the
sweep of its judicial power, and the Reno decree is void
for want of jurisdiction, and is therefore not "due pro-
cess of law."   Thompson v. Thompson, 226 U. S. 562;
Haddock v. Haddock, 201 U. S. 576; Parker v. Parker,
222 Fed. 191; Pennoyer v. Neff, 95 U. S. 733; Taylor
on Due Process of Law (1917) secs. 139, 142.   (14)
The husband himself had acquired no bona-fide domicile
in Nevada.   (a)  Where the wife is a non-resident, and
the husband has no bona-fide domicile in the State de-
creeing the divorce, the court is without jurisdiction, the
divorce judgment is void, and the decree is entitled to
no faith and credit in any State.   In re Akin's Estate,
152 N. Y. Supp. 310; Streitwolf v. Streitwolf, 181 U. S.
179; Bell v. Bell, 181 U. S. 178; Dunham v. Dunham,
162 Ill. 589; Thelen v. Thelen, 75 Minn. 433; Van Fossen
v. State, 37 Ohio St. 317; Litowitch v. Litowitch, 19
Kan. 451; Sewall v. Sewall, 122 Mass. 156; Gregory
v. Gregory, 78 Me. 187; People v. Dowell, 25 Mich. 247;
Leith v. Leith, 39 N. H. 20; Magowan v. Magowan, 57
N. J. Eq. 322; Winston v. Winston, 165 N. Y. 553, 189
U. S. 506; Andrews v. Andrews, 188 U. S. 41. (b) The re-
cital in the proceedings in Nevada of the facts necessary
to show jurisdiction may be contradicted on collateral at-
tack. Bell v. Bell, 181 U. S. 178; Thompson v. Whitman, 18
Wall. 457; Parker v. Parker, 22 Fed. 191; Kunzi v. Hick-

man, 243 Mo. 103. (c) Said recitals have been contradicted in this case by evidence more cogent than that in any of the foregoing decisions, or in any other reported case. (d) The essential fact that raises change of abode to change of domicile is the absence of any intention to live elsewhere. Williamson v. Osenton, 232 U. S. 619. (15) "In order to make the divorce valid, either in the State in which it is granted or in another State, there must, unless the defendant appeared in the suit, have been such notice to her as the law of the first State requires." Cheely v. Clayton, 110 U. S. 705, 709; Atherton v. Atherton, 181 U. S. 164; Kunzi v. Hickman, 243 Mo. 113; Thompson v. Thompson, 226 U. S. 551; Grannis v. Ordean, 234 U. S. 393. (16) "In divorce proceedings, particularly where the State is a silent but interested party, constructive service is viewed strictly, and where there is no appearance every essential requisite of the statute for such service must affirmatively appear." Parker v. Parker, 222 Fed. 190; Kunzi v. Hickman, 243 Mo. 103; Galpin v. Page, 18 Wall. 350; Shrader v. Shrader, 36 Fla. 502. (17) Service upon the wife was not made strictly in accordance with the Nevada law in the following particulars, viz: (a) The writ of summons was fatally defective because it failed to state where or in what court, or when and on what day certain, the wife should appear and defend the cause. Kunzi v. Hickman, 243 Mo. 103. (b) The summons was published for only six weeks, instead of for three months. 2 Nevada Statutes 1912, sec. 5839, p. 104. (c) The Nevada statutes relative to service upon non-resident defendants in divorce actions are *in pari materia* with Sections 5026 and 5027, which provide for such service in civil actions other than divorce actions, and both will be permitted to stand as valid, the divorce sections as applicable exclusively to divorce actions, and the other sections as applicable exclusively to other civil actions. 2 Sutherland on Statutory Construction, secs. 443, 448, pp. 844, 854; also, sec.

367, p. 705. (d) So much of Section 5839 as undertakes to delegate to the court or judge in vacation any right or power or authority to order notice of the pendency of the suit "to be given in such manner and during such time as shall appear most likely to convey knowledge thereof to defendant" was and is null and void, in that it undertakes to delegate to a judicial department of the government a power which the Constitution of the State of Nevada reposes in the legislative department, and in that it undertakes to substitute the caprice of the individual as to the time and manner of notice for the certainty required by law. Constitution of Nevada, art. 4, sec. 1, sec. 21; Black's Constitutional Law, sec. 105, p. 279; State v. Young, 29 Minn. 474; Cooley on Constitutional Limitations, sec. 116. (e) The glory of American law consists in clearly defining not only the causes wherefore, but the times when, the manner how, and the means whereby, the personal and property rights of the citizen may be invaded or abridged. Any enactment which fails to measure up to this standard of certainty is not American law, and American courts frequently declare statutes void for uncertainty. State v. Ashbrook, 154 Mo. 378; State v. Railway Co., 146 Mo. 155. (f) Where discretion exists, uncertainty exists. Matthews v. Murphy, 23 Ky. Law Rep. 750, 63 S. W. 785; Railroad v. Commonwealth, 99 Ky. 132; Commonwealth v. Railroad, 20 Ky. Law Rep. 491; State v. Cummings, 36 Mo. 278. (g) The Reno decree is void under the Nevada law for the further reason that the judge usurped the constitutional functions of the jury. Nevada Constitution, sec. 3, art. 1, p. 105. (h) This constitutional provision is self-executing and self-enforcing. It was not waived and could not be waived by Section 5845 of the Nevada statutes, or by any possible action of the court, or the judge of the court, or in any manner other than by the voluntary action of the wife herself. Nevada Constitution, sec. 3, art. 1; 24 Cyc. 154, sec. b, note 50. (18) Independent of any question of jurisdiction in the Nevada court: (a) The

Missouri decree "was a decree not against but in favor of the wife in the maintenance suit, which decree necessarily conclusively settled that the separation was for cause and was without fault on the part of the wife." Harding v. Harding, 198 U. S. 338. (b) That decree foreclosed and merged all acts and conduct of both parties up to and including the date of its rendition. It determined the status of the wife as an innocent and injured party. "So far as it did that, it is a judgment that is operative and conclusive as to all the world." Atherton v. Atherton, 181 U. S. 168; Harding v. Harding, 198 U. S. 341. (c) It forever estopped the husband "from averring anything to the contrary" of that status, and any conflicting decree procured by him on such contrary averment, whether of the same or a sister state, is utterly and absolutely void. Anthony v. Rice, 110 Mo. 228; Atherton v. Atherton, 181 U. S. 172; Harding v. Harding, 198 U. S. 317; Barber v. Barber, 62 U. S. 582; Sistare v. Sistare, 218 U. S. 11. (19) When an inhabitant of this State goes into another State or country to obtain a divorce for any cause occurring here, and while the parties resided here, or for any cause which would not authorize a divorce by the laws of this State, a divorce so obtained is of no force or effect in this State. In all other cases, a divorce decreed in any other State or country according to the laws thereof, by a court having jurisdiction of the cause and both the parties, is valid and effectual in this State. Atherton v. Atherton, 181 U. S. 167; Ross v. Ross, 129 Mass. 248; Hood v. Hood, 11 Allen, 196; Thompson v. State, 28 Ala. 13; Leith v. Leith, 39 N. H. 39; Shafer v. Bushnell, 24 Wis. 372; Gould v. Crow, 57 Mo. 200; Van Orsdal v. Van Orsdal, 67 Iowa, 35; Smith v. Smith, 43 La. Ann. 1140; In re James, 99 Cal. 374; Dunham v. Dunham, 162 Ill. 607; Shaw v. Shaw, 98 Mass. 158; Andrews v. Andrews, 188 U. S. 41. (20) That Wagoner went to Reno to obtain a divorce is a presumption so strong as to wear the guise of certainty. And that one fact alone renders

the Reno decree "fraudulent and void as to his wife."
Gould v. Crow, 57 Mo. 203. Independent of that fact
however, it stands admitted that: (a) Wagoner left
Missouri for the purpose of placing himself beyond the
jurisdiction of the court in which the maintenance case
was pending; and he sedulously kept himself without
the jurisdiction, and transacted all his local business—
even his conferences with counsel—in East St. Louis
and in Alton, Ill., without having paid any part of the
maintenance due, or leaving uncovered any estate of
any kind out of which it could be paid. (b) He did
not disclose to the Reno court any of the circumstances
of the St. Louis litigation, or the existence of the St.
Louis suit, or of the St. Louis decree. (c) Contrary
to the truth, verified by the St. Louis decree, he asked
for a divorce on account of the alleged misconduct of
an innocent and abandoned wife. In each of these three
particulars there is enough fraud to defeat and impeach
the Reno decree. Barber v. Barber, 62 U. S. 588. (d)
Moreover, the affidavit made by Wagoner to his Reno
petition that he had been a resident of Nevada for
six months (whereas his own deposition now in evidence
and uncontradicted shows that he had been a resident
less than one month), was a fraud practiced upon the
Nevada court—a fraud which renders the Nevada de-
cree not merely voidable, but wholly void. Dorrance v.
Dorrance, 242 Mo. 651. (e) Again, the fact that Wagon-
er dismissed his divorce suit in St. Louis, in the face
of his wife's defense, left her there deserted and penni-
less, and thereafter re-filed his suit in Reno, well know-
ing that she was disqualified by destitution from litiga-
ting with him at such a distance from her evidence and
from the charity on which she was dependent for sup-
port, was "a fraud upon the court for the purpose of
depriving the defendant of the opportunity to be heard,
which is the foundation of all legal process;" and was
a fraud which "will vitiate any, even the most solemn
transactions." Dorrance v. Dorrance, 242 Mo. 651. (f)
Finally, we find the Reno divorce coming on the heels

of an elaborate and long-successful conspiracy to defraud the wife of her maintenance by fraudulent transfers of property, by flight, concealment, frequent change of abode, registration under an assumed name, destruction of books, records, and papers, and all the other arts, artifices, and devices of which the monster of chicane is formed. Here, then, is a situation indubitably begun in fraud, and long colored by fraud, and in such circumstances the presumption is strong that fraud persists throughout the action. It is a case which calls for the application of the maxim: "The end of the act shall be construed by the beginning of the act, and the last part shall taste of the first." Queen v. Saunders (1572), Plowden's Rep., p. 474. (g) Add to the above the long accumulation of fraudulent shifts, twists, and evasions detailed in our chronology, and you have a case more overwhelming in its arrogance, more overmastering in its conviction, than any to be found in the annals of American jurisprudence. It defies comparison. Dorrance v. Dorrance, 242 Mo. 625, 257 Mo. 317. (21) The Federal court's order of October 1st, 1917, overruling and denying the husband's motion for a temporary injunction to restrain the execution of the State court's decree—a motion raising the same issues as the instant motion—was *res judicata* of every question which it decided. Johnson v. Latta, 84 Mo. 139; Appeal of Gardinier, 89 Pa. St. 528; Weber v. Tschetter, 1 S. D. 205; Langdon v. Raiford, 20 Ala. 532; Burritt v. Tidmarsh, 1 Ill. App. 571; Kaufman v. Schneider, 35 Ill. App. 256; Grier v. Jones, 54 Ga. 154; Day v. Mertlock, 87 Wis. 577; Robitshek v. Bank, 72 Minn. 319; McDonald v. Seligman, 81 Fed. 753; Buckles v. Railroad, 53 Fed. 566; Spitley v. Frost, 15 Fed. 229; Bank v. Haerling, 106 Iowa, 505. (a) It was competent to show by parol testimony that Judge Dyer held the Reno decree to be invalid, and made such holding the ground of his order refusing an injunction. Spradling v. Conway, 51 Mo. 54; Hickerson v. Mexico, 58 Mo. 61; West v. Moser, 49 Mo App. 201; Haseltine v. Thrasher, 65 Mo. App. 334;

Short v. Taylor, 137 Mo. 517; La Rue v. Kempf, 186 Mo. App. 74. (b) In the Federal Court case the husband took the position that the wife was a party to that litigation by the doctrine of 'representation. We think that in this he was right, but whether he was or not, he is bound by the position he then assumed, and he will be held to it here. Starbuck v. Starbuck, 173 N. Y. 503; State ex rel. v. Holtkamp, 266 Mo. 366; Coleman v. Farrar, 122 Mo. 54; Boogher v. Frazier, 99 Mo. 331. (22) The Reno decree could in no event operate on property or property rights situated in Missouri. Those rights remain just as they were before, unmodified and unchanged by any judgment any Nevada court could pronounce on mere constructive service. Pennoyer v. Neff, 95 U. S. 714; Haddock v. Haddock, 201 U. S. 604; Parker v. Parker, 222 Fed. 191; Minor on Conflict of Laws, p. 184; Taylor on Due Process of Laws, sec. 143, p. 324; Barber v. Barber, 62 U. S. 588; Harding v. Harding, 198 U. S. 330; Wilson v. Railway Co., 108 Mo. 596; State ex rel. v. Blair, 238 Mo. 153. (23) In any event, the Circuit Court's power to modify could not operate retroactively on past due installments. Sistare v. Sistare, 218 U. S. 1, 13; Barber v. Barber, 62 U. S. 582; Goodsell v. Goodsell, 82 N. Y. App. Div. 70; Livingston v. Livingston, 173 N. Y. 377.

*Fauntleroy, Cullen & Hay* for respondent.

(1) A motion filed in the maintenance case is the proper remedy to vacate a continuing judgment, payable at stated periods in the future. Pritchard v. Pritchard, 189 Mo. App. 470; Creasy v. Creasy, 175 Mo. App. 237; Creasy v. Creasy, 168 Mo. App. 98; Bidwell v. Bidwell, 139 N. C. 402; 6 C. J. pars. 6 and 7, pp. 852, 853; Karren v. Karren, 60 L. R. A. 304. (2) When the right to demand and receive future alimony is discretionary with the court which rendered the decree, no absolute or vested right attaches to receive the installments ordered by the decree to be paid, even although no application to annul or modify the decree in respect to

alimony has been made prior to the installments becoming due.  Lynde v. Lynde, 181 U. S. 186; Sistare v. Sistare, 218 U. S. 11, 20 Ann. Cas. 1061, 28 L. R. A. (N. S.) 1068; Barber v. Barber, 21 How. 582; Cotter v. Cotter, 225 Fed. 471; Mayer v. Mayer, 154 Mich. 117, 19 L. R. A. (N. S.) 245, 129 Am. St. 477; Cureton v. Cureton, 132 Ga. 745; Van Horn v. Van Horn, 48 Wash. 338, 93 Pac. 670, 125 Am. St. 940; Bleuer v. Bleuer, 27 Okla. 25, 110 Pac. 736; Hunt v. Monroe, 32 Utah, 428, 11 L. R. A. (N. S.) 249, 91 Pac. 269.  (3)  The decree for maintenance being "until further order of the court," was subject to modification under the Missouri Laws.  R. S. 1909, sec. 8295; 1 Ruling Case Law, sec. 92, p. 946; Creasy v. Creasy, 168 Mo. App. 110; Creasy v. Creasy, 175 Mo App. 239; Prichard v. Prichard, 189 Mo. App. 470.  (4)  The decree of divorce entered by the district court of Nevada is valid on the theory of comity and public policy, and under the Constitution requiring that full faith and credit shall be given to proceedings in other States.  Howard v. Strode, 242 Mo. 225; Gould v. Crow, 57 Mo. 204; Anthony v. Rice, 110 Mo. 227; Lieber v. Lieber, 239 Mo. 30; Henderson v. Henderson, 265 Mo. 738.  (5)  The prevailing doctrine is that such decrees are valid on the theory of public policy and comity between the States, and this is the established doctrine in Missouri.  The Missouri cases, supra; Gildersleeve v. Gildersleeve, 88 Conn. 689; Douglas v. Teller, 102 Pac. 763; Joyner v. Joyner, 131 Ga. 217, 18 L. R. A. (N. S.) 647, 127 Am. St. 220; McCormick v. McCormick, 82 Kan. 31, 107 Pac. 546; Knowlton v. Knowlton, 155 Ill. 158; Stevens v. Allen, 71 So. (La.) 936, L. R. A. 1916-E, 1115; Hekking v. Pfaff, 82 Fed. 403; Thompson v. State, 28 Ala. 12; Thompson v. Thompson, 91 Ala. 591, 11 L. R. A. 443; Re James, 99 Cal. 374, 33 Pac. 1122; Dunham v. Dunham, 162 Ill. 589, 35 L. R. A.; Hood v. State, 56 Ind. 263, 26 Am. Rep. 21; Hilbish v. Hattle, 145 Ind. 59, 33 L. R. A. 783; Wakefield v. Ives, 35 Iowa, 288; Kline v. Kline, 57 Iowa, 386, 42 Am. Rep. 47; Van Orsdal v.

Van Orsdal, 67 Iowa, 35, 24 N. W. 579; Chapman v. Chapman, 48 Kan. 636, 29 Pac. 1071; Hawkins v. Ragsdale, 80 Ky. 353, 44 Am. Rep. 483; Smith v. Smith, 43 La. Ann. 1140; Benton's Succession, 106 La. 494; Harding v. Alden, 9 Mc. 140, 23 Am. Dec. 549; Eldred v. Eldred, 62 Neb. 613, 87 N. W. 340; Ditson v. Ditson, 4 R. I. 87; Thomas v. King, 95 Tenn. 60, 31 S. W. 983; Shafer v. Bushnell, 24 Wis. 372. (6) A decree of divorce rendered in another state is held valid even by the Supreme Court of the United States, where the plaintiff has in good faith fully complied with the laws of the state where the decree is granted and where he was a bona-fide resident of said state. Thompson v. Thompson, 226 U. S. 551; Atherton v. Atherton, 181 U. S. 155; Cheeley v. Clayton, 110 U. S. 701. (7) There is nothing in the Federal Constitution which prohibits a State court from recognizing a foreign divorce as valid. Finney v. Guy, 189 U. S. 345; Haddock v. Haddock, 201 U. S. 606; Howard v. Strode, 242 Mo. 225. (8) A cause of action for divorce in favor of a husband is not barred by a judgment for separate maintenance in which she obtains a decree. Watts v. Watts, 160 Mass. 464, 36 N. W. 479, 39 Am. St. 509, 23 L. R. A. 187. (9) The Nevada decree operates as *res judicata,* not only in regard to the existence of the plaintiff's cause of action, but as to the non-existence of the defense which was not pleaded. Roth v. Merchants Bank, 70 Ark. 200, 66 S. W. 918; Dunham v. Bower, 77 N. Y. 76, 33 Am. Rep. 570; Case Mfg. Co. v. Moore, 144 N. C. 527, 10 L. R. A. (N. S.) 734, and note; Morrill v. Morrill, 20 Ore. 96, 25 Pac. 362, 11 L. R. A. 155; Howard v. Huron, 5 S. D. 539, 59 N. W. 833, 26 L. R. A. 493; Cromwell v. Sac County, 94 U. S. 351, 24 U. S. (L. Ed.) 195; Royston v. Horner, 86 Md. 249. (10) The question of alimony not only might have been, but should have been litigated in the Nevada divorce suit itself, and the judgment in said action, even though silent as to alimony, operates as *res judicata* not only as to the right to a divorce or separation, but as to the question

of alimony as well. Howell v. Howell, 104 Cal. 45, 37 Pac. 770; Chapman v. Parsons, 66 W. Va. 307, 24 L. R. A. (N. S.) 1015; Wood v. Wood, 59 Ark. 441, 27 S. W. 641, 28 L. R. A. 157; Sprague v. Sprague, 73 Minn. 474, 76 N. W. 268, 42 L. R. A. 419; Julier v. Julier, 62 Ohio St. 90, 78 A. S. R. 697; Fischli v. Fischli, 1 Blackf. (Ind.) 360, 12 Am. Dec. 251; United States v. Bliss, 172 U. S. 326. (11) The Nevada divorce is not void because it does not affirmatively appear that the Nevada court was informed of the maintenance suit. Bader v. Bader, 4 Am. & Eng. Ann. Cases, 854; 1 Cyc. 36; Wood v. Wood, 56 Fla. 882. (12) The final judgment entered by the court in the divorce case was a judgment upon the same rights of the same parties relating to the same subject-matter and was later in point of time and will therefore prevail; of two conflicting judgments, that which is later in time will prevail. Stoltz v. Coward, 10 Tex. Civil App. 295, 30 S. W. 935; 1 Freeman on Judgments, sec. 332; Cooley v. Brayton, 16 Iowa, 10. (13) There was no evidence of fraud or bad faith under any rule, and certainly none within the meaning of the rule which affects judgments. Leiber v. Leiber, 239 Mo. 31; Blass v. Blass, 194 Mo. App. 624; Hanley v. Donoghue, 116 U. S. 1; Wisconsin v. Ins. Co., 127 U. S. 265; Simmons v. Saul, 138 U. S. 439; Hilton v. Guyot, 159 U. S. 113; Rogers v. Alabama, 192 U. S. 231; L'Engle v. Gates, 74 Fed. 513; Christiansen v. Kriesel, 133 Wis. 508, 113 N. W. 980. (14) The service by publication was in strict compliance with the laws of Nevada and sufficient in form to afford the requisite notice. Clemson College v. Pickens, 49 S. Car. 511; Jasper County v. Wadlow, 82 Mo. 172; Osgood v. Osgood, 153 Mass. 38; Lewis v. Weidenfeld, 114 Mich. 581; National Bank of New York v. Bank of Boston, 89 N. Y. 397; Sherman v. Sherman, 111 Pac. (Nev.) 286; Pratt v. Stone, 85 Nev. 365, 60 Pac. 514. (15) A refusal to grant a temporary injunction against the attorneys of a client not a party to the action is not *res judicata*, especially when the main case is dis-

missed without prejudice. Harrison v. Rush, 15 Mo. 175; Witthaus v. Savings Bank, 18 Mo. App. 183; Tanner v. Irwin, 1 Mo. 65; Johnson v. Board of Education, 65 Mo. 47; Williams v. Field, 2 Wis. 421, 60 Am. Dec. 426, 24 Am. & Eng. Ency. Law (2 Ed.), 817. (16) Under the laws of Nevada, divorce cases are not triable by a jury. Wuest v. Wuest, 30 Pac. (Nev.) 886; Maugels v. Maugels, 6 Mo. App. 484; Mead v. Mead, 1 Mo. App. 247; Sharon v. Sharon, 67 Cal. 185, 7 Pac. 456; McFarland v. Mo. Pac. Ry. Co., 125 Mo. 253, 28 S. W. 590; Grand Lodge Order of Herman Soehne v. Elsner, 26 Mo. App. 108. (17) When a former pending case is dismissed before the hearing in the second case, it does not operate to abate the second case. Martin v. Cotton Oil Co., 194 Mo. App. 111; Warder v. Henry, 117 Mo. 530; State ex rel. v. Hines, 148 Mo. App. 304.

BROWN, C.—This appeal is taken from an order or judgment of the Circuit Court of the City of St. Louis vacating its decree for maintenance entered on February 11, 1916, in the same suit, upon plaintiff's petition filed in said court April 30, 1915, in which she stated that she was married to defendant in September, 1887; that their home was at No. 4167 Lindell Avenue in the City of St. Louis until at or about February 5, 1913, when the defendant, without any cause, abandoned and deserted plaintiff, and that thereafter the plaintiff continued to reside at the same place; that respondent had a large amount of property and enjoyed a large income; that on May 16, 1914, he sued plaintiff for divorce, that she contested the suit and filed therein a motion for alimony *pendente lite,* which resulted in a stipulation that she would vacate the said residence and that he would pay her monthly alimony at the rate of one hundred and fifty dollars per month, which he did until February 10, 1915, when he dismissed his said divorce suit and had refused to make further payments of alimony, and had, without cause, deserted and abandoned her, and that she was without any means whatever for her support.

This decree was entered on said petition February 11, 1916, and contains a finding that the allegations of the petition are true, and that plaintiff was entitled to the relief prayed, and adjudged that she recover from defendant for her support and maintenance the sum of four hundred dollars per month, the first payment to be made on that date, and the further sum of seven hundred and fifty dollars suit money and her costs.

On October 8, 1917, the defendant filed his motion in this proceeding, wherein he stated that on November 21, 1916, he had recovered judgment in the District Court of Nevada for the County of Washoe, dissolving the bonds of matrimony theretofore existing between himself and plaintiff, that plaintiff had sued out execution on this judgment for maintenance, under which one share of stock of the Wagoner Undertaking Company, and one share of stock of the Wagoner Realty Company had been sold for $4200, which was then in the hands of the sheriff, and that she had caused other stock to be levied on, and praying the court "to order that said judgment terminate on November 21, 1916, and to restrain the plaintiff from taking any action to enforce said judgment so far as it purports to give the plaintiff any right to a judgment after November 21, 1916."

The order or decree appealed from was made upon this motion and in accordance with its prayer, so that the only question raised by the appellant is whether or not the Nevada judgment which it pleads *ipso facto* vacated the judgment for maintenance, and entitled the respondent to injunctive relief against further proceedings for its enforcement.

The appellant pleaded to the motion among other things: (1) a suit by this respondent against appellant pending in the United States District Court for the Eastern District of Missouri, Second Division, asking the same relief, and involving the same issues; (2) a suit between the same parties and in the same court to sequester and impound property of this defendant for the satisfaction of this same judgment, in which the same facts are

in issue, that is to say, the effect of the Nevada judgment; (3) a judgment of the said United States District Court in the said cause then and there pending refusing an interlocutory injunction against the enforcement of this same judgment on the same grounds now presented in this motion for the same relief; (4) that the judgment shows on the face of the judgment roll that the matrimonial domicile of both plaintiff and defendant was in the State of Missouri and that all the acts relied on as grounds for divorce were committed in the State of Missouri, while in fact the matrimonial domicile of both plaintiff and defendant had always been in St. Louis, where all the property of defendant was and always had been located; that this judgment, and the right to the relief granted, is a property right protected by Section 30 of Article 2 of the Constitution of Missouri, and Section 1 of the Fourteenth Amendment to the Constitution of the United States, of which the decree of the Nevada court attempts to deprive plaintiff without due process of law; (5) non-conformity with the laws of Nevada in obtaining jurisdiction of the defendant in the divorce suit.

It also pleaded fraud and perjury in the act of procuring the judgment in Nevada affecting the jurisdiction of the Nevada court.

There are no disputed *facts* in the case, and not much room for dispute in the inferences naturally flowing from such facts. The plaintiff and defendant were married at Greenville, Illinois, on September 8, 1887. According to his testimony defendant was at that time only twenty years old, and lived in St. Louis, where they intended at the time to make their permanent home. They did live there until they became separated during the difficulties of which this suit is one of the incidents. How old the plaintiff was at the time of the marriage does not appear in the evidence. It does appear, however, from the record, that they resided together in that city until sometime in 1913, when he left her living alone in the house at 4167 Lindell Avenue, and from which he threatened to eject

her, and a month or two afterward came to the house drunk at about two o'clock in the morning and broke through the front door with a club and entered. This he describes in evidence as one of his little pleasantries.

On May 16, 1914, defendant brought suit for divorce against plaintiff, alleging as the grounds therefor such indignities as to render his condition intolerable, and specifying that she refused to bear children; that on their wedding trip she quarrelled with him and refused to speak to him; that she was afraid to leave him alone in the house with the female servants; constantly boasted of the superiority of her ancestry and made disparaging remarks about his; was jealous, accused him of paying the expenses of a European trip for a young woman with whom she charged him with being madly in love, charged him with being intimate with different women with whom he associated, complaining that he would not come home when she wanted him and stayed out in the evening, and criticised him generally.

While this suit was pending he entered the house at 4167 Lindell Avenue where she resided, whereupon, fearing personal violence, she locked herself in a room on the second floor, and he thereupon refused to allow her counsel to have any communication with her; cut the telephone connection; ejected the maid, and brought his mother and sister-in-law to live in the house with the intention of forcing plaintiff to leave it.

On October 5, 1914, she filed her motion for alimony *pendente lite* and suit money, upon which this defendant promptly stipulated to pay her alimony at the rate of $125 per month and she, through her attorneys, agreed to vacate the residence, which she promptly did. On the 8th of October, 1914, she filed her answer, in which she admitted the marriage and denied every other allegation of the petition. On January 30, 1915, he dismissed the divorce suit, ceased paying her the alimony adjudged by the court, and on April 26, 1915, transferred to his mother all his property, including stock in the Wagoner Undertaking Company, from which he was then realizing an

income which he refused on the witness stand to esti-
mate, and which the evidence then given shows to have
been as much as $20,000 per year. That she was abso-
lutely destitute of means of support was adjudicated in
this suit, and we find no evidence in the record which
tends to show that the same condition does not continue.

That the transfer to his mother was made without
any pecuniary consideration is not denied. It is admit-
ted that his mother assumed and carried liberally the
burden of his support, and he explains the transaction
by saying that when this condition ceases at her death
it will be his. When asked how this burden was assumed
the mother says, "It was not in words, nothing was said
in words;" and when pressed for some expression on her
part of so important an undertaking, retorts with the
question: "What would your mother say to you if you
were going away?" The defendant says: "I turned this
stock over to my mother by reason of the fact that
I was the owner of it and had the right to do it, to do
with it as I pleased." He also said: "It is a fact that
since I turned over all of this stock to my mother I have
been wholly insolvent and execution proof. I have not
contributed anything to my wife's support since that
time, no sir. I cannot come within $20,000 of telling you
how much the Undertaking Company made. I cannot
come within $20,000 of telling you how much it made in
the year 1914. I cannot come within $30,000 of telling
you how much it made in either one of those years." He
also said that at Reno his mother gave him the money to
pay his board bills which were $200 per month.

On May 5, 1915, respondent left St. Louis and from
that time on seemed to be hunting diligently for a rest-
ing place. From the 6th of that month to the 11th he
was at Walnut Log, Tennessee. From there he went to
Alton, Illinois; then to San Francisco and to Los An-
geles, and thence to various places in California. He
seems to have made a flying visit to Reno in July, 1915,
and again took up his pilgrimage from place to place and
again arrived in Nevada on January 6, 1916; and put up

at the Riverside Hotel, where he engaged board at the rate of $200 per month, which his mother furnished him the money to pay. During all that time he did not communicate with his wife and, to use his own elegant diction, he has communicated with her in no form, shape and manner since. He also says that he had no usual place of abode from the time he left St. Louis during his various wanderings, but he testifies as follows: "The purpose of my moving about among the twelve or fifteen resorts I have named, was to investigate the situation and conditions there with the object in view of permanently locating there." He was seeking rest and finding none. When he arrived at Reno on January 6, 1916, he felt that he had found a home. He also found a friend, Mr. Steinmetz, a dealer in furniture and carpets in that city, who not only accompanied him on fishing and hunting expeditions, but employed him in his store at a salary of $75 per month. Mr. Steinmetz, testifying in his behalf in the Reno divorce case, said: "He took a great deal of interest in the store. He would come over there about noon when I went away to lunch, and most of the men were away at noon, and he would take part there, answering the 'phone, assisting in little general duties in the store. I am able to say that he has been a resident of Washoe County since early in January." The same witness testifying in a deposition taken at Reno on November 26, 1917, said: "Q. Did you before or have you since Mr. Wagoner's divorce suit, discussed with him the divorce suit? A. I hardly know how to answer that, Mr. Price. I know that he was here for a divorce." A week or two after the entry of judgment in his divorce case Mr. Wagoner seems to have abandoned all idea that he resided in Nevada.

This appeal was taken March 28, 1918; the short transcript filed April 2, 1918; and was set for hearing in this court and was heard and submitted on January 23, 1920.

Appellant's abstract of the record was filed and served on December 23, 1919. On January 21, 1920, the

respondent filed his brief containing an additional abstract of the record as follows: "The testimony on plaintiff's motion for allowance *pendente lite* filed October 12, 1917, and overruled October 31, 1917, is omitted from the record prepared by appellant. The testimony so omitted showed that the plaintiff became the half owner of 640 acres of land in Illinois upon being divorced from defendant, and the proof showed that said land was of the value of $100 per acre."

The appellant thereupon and on the day of the hearing, filed its motion to strike said additional abstract from the files as being out of time under our Rule 11; that the matters so set out were not contained in the bill of exceptions which was brought into court and filed for our inspection; and were false.

This motion was taken with the case. On February 16, 1920, the respondent filed with the clerk of this court a purported copy certified by one describing himself as "acting official stenographer of the trial court," of testimony taken in said court on October 25, 1917, on a motion of plaintiff for an allowance *pendente lite,* which tended to show that by the will of appellant's mother, who died in Illinois on April 28, 1916, she devised 480 acres of land, estimated by the respondent's witness to be worth from $80 to $125, to her two daughters, the devise to appellant to take effect upon the death of respondent or appellant's divorce from him. The condition of the estate was not shown. The will appointed the sister, Miss Blanchard, executrix and trustee.

1   We do not think that either the statement in respondent's brief under the title of "Additional Abstract," to which we have referred in the closing paragraph of the foregoing statement, nor the paper filed since the hearing, purporting to be copied from the stenographer's notes of evidence received upon the hearing of another motion in the principal case, should be considered by us as a part of this record, for the following reasons:

Additional
Abstract.

(a)  Were it really a part of this record it was filed so far out of the time permitted by our Rule 11 without excuse or explanation for the delay that its consideration would establish a precedent destructive of the rule.

(b)  The notes are so much at variance from the statement of the additional abstract as to indicate entire absence of care in preparing the latter version of the fact.

(c)  It constitutes no part of the record of this trial as the bill of exceptions does not show that it was introduced or otherwise considered in this hearing.

We are relieved from all embarrassment by the fact which will presently more fully appear, that the testimony referred to, if properly before us, would have no bearing upon the questions which we shall consider.

II.  The sole question brought before us by this appeal is whether or not the decree of divorce entered in the Nevada court at Reno on November 11, 1916, vacated, *ispo facto,* as of its date, the decree for separate mainte-

Fraudulent
Judgment.
nance in favor of appellant and against respondent entered on February 11, 1916. This point is unmixed with any question relating to the power or duty of the St. Louis court to modify or vacate its decree for separate maintenance on any other ground. It follows that whatever we shall say will be limited to the validity, force and effect of the Nevada decree in that respect alone. In considering this we will ignore interesting propositions presented in argument as to the irregularity of the proceedings under which the Nevada court undertook to acquire jurisdiction of the defendant under the laws of that State, except in so far as they suggest fraud in that respect, for, in every civilized country, so far as we know, the law refuses to lend the aid of its process to the accomplishment of fraud. As was long ago said by an American court in Mitchell v. Kintzer, 5 Pa. St. l. c. 217: ''In the eye of the law, fraud spoils everything it touches. The broad seal of the Commonwealth is crumbled into dust, as against the interest designed to be defrauded. Every transaction of life be-

tween individuals, in which it mingles, is corrupted by its contagion. Why then, should it find shelter in the decrees of courts?" "Even the terms of an act of the Legislature cannot be made an instrument of fraud, but must yield to the honest purpose for which it was enacted." [Lightner Mining Co. v. Lane, 161 Cal. l. c. 698.] And as has been said by us in numerous cases, "When fraud in obtaining a judgment is made to appear, the estoppel of the judgment vanishes." [Lewis v. McCabe, 76 Mo. l. c. 309; Callahan v. Griswold, 9 Mo. 784; Edgell v. Sigerson, 20 Mo. 494; Ward v. Quinlivin, 57 Mo. 425; Dorrance v. Dorrance, 242 Mo. l. c. 651-2; United States v. The Amistad, 15 Pet. l. c. 594.] "Relief may be had from it not only in equity, but it constitutes a defense at law, so that no judgment can be recovered on a cause of action tainted with fraud." [Dorrance v. Dorrance, supra and cases cited.] This principle is so often stated that it may appropriately be called a platitude of the law. It is the protest of the courts of both law and equitable jurisdiction, against being made the instruments of fraud. They may be deceived to the detriment of innocent suitors, but this deception will not be permitted to ripen into injury unless the suitor has been given an honest opportunity to protect himself. Judged by this standard we are to inquire whether the appellant was, in the procurement of the Nevada decree wrongfully and by artifice equivalent to actual deceit, deprived of that opportunity.

There is nothing in this record which tends to impeach the character of appellant, or to cast doubt upon her faithfulness to every connubial duty during the twenty-nine years of the marriage relation between her and the husband, unless it be found in the act of the Nevada court in entering its decree of divorce. Even the complaint upon which it was entered is ridiculous in the light of the charge of extreme cruelty which it was framed to sustain. Neither that pleading nor the evidence contains a word of specification which sustains the charge. It begins with the statement that ten days after the marriage and while on the wedding trip she "pub-

licly and in the presence of strangers upbraided and harangued the plaintiff,'' and runs down the gamut of the English alphabet to the letter ''p,'' under which it specified that she is a person of irascible temperament and nagging and fault-finding disposition. All these things are alleged to have been done in the City of St. Louis and necessarily before the entry of the decree for maintenance now before us, and during the time when the parties were living together as husband and wife before the institution of the divorce suit of respondent against appellant, which we will have further occassion to notice.

The service of the original process in the Nevada suit was by publication and the mailing of a copy of the notice published to the appellant at the Windermere Hotel in St. Louis. She was living with her own people at Greenville, Illinois, at the time, but received the letter in due time and took it to St. Louis and gave it to her attorneys, Lehmann & Lehmann and Thompson & Thompson. She was without money and unable to go to Reno or to take any other steps in the case, while her attorneys were unwilling to make or finance any defense in Nevada, and did not think it was necessary on the ground that the Nevada court had acquired no jurisdiction. In this way it came to pass that she made no appearance in that suit, which resulted in the decree of divorce upon which respondent depends to sustain the judgment of the trial court.

Whether the Nevada court obtained jurisdiction of the appellant by these proceedings calls for a brief consideration of the facts.

After the parties had been married as much as twenty-five years, and lived in apparent peace in St. Louis, in their home at 4167 Lindell Boulevard, some trouble arose between them. On February 5, 1913, he abandoned her, leaving her in the house alone, and has not lived with her since. He finally broke in on her possession of the house with a club with which he smashed the glass of the front door. This transaction he describes in testimony as one of his little pleasantries.

On May 16, 1914, he brought suit for divorce against her, alleging "indignities," the most of which are alleged against her as "cruelties" in his Nevada complaint.    To this she filed a motion for alimony *pendente lite* which was allowed in a very moderate amount by stipulation. She then answered, and gave notice to take his deposition.   On February 1, 1915, he dismissed his divorce suit and she instituted, in the same court, her suit for separate maintenance under our statute, on the ground of abandonment.    This, after a warm contest over the service of process, resulted in a judgment for maintenance at the rate of $400 per month.

At the death of respondent's father in 1906, he had succeeded to certain stocks and other securities which became very valuable.   Among these was a block of stock in the Wagoner Undertaking Company.   He declined to state his income on these, but the evidence shows that it had reached twenty or thirty thousand dollars per year, and perhaps more.

After the dismissal of his divorce suit the respondent prepared for trouble.   He paid his wife no alimony. She was destitute, and he knew she contemplated bringing a suit for separate maintenance, and paid her one hundred dollars to delay it so that it would not be returnable at the next April (1915) term, and on April 26, 1915, he transferred everything he had, including the securities we have described, to his mother.   There is no pretense that he received anything from her for this property.   He says he transferred it to her because it was his and he had the right to do so, and that his mother agreed to support him.   She was examined and knew nothing about the income except that it was sent to the respondent in such sums as he needed.   He then undertook to gather the fruit of appellant's promise to delay any further proceeding until after the April term by a pilgrimage in which his mother and another woman whom she describes as a dear friend joined him.   During the months that succeeded they visited many states, but ignored the resorts in which Missouri process could be served so

carefully that it was necessary for his St. Louis attorneys to go to the other side of the river for consultation with him. His mother testified that his wife, the appellant, had everything to do with this pilgrimage, which he contended blotted his home from the map of the State, and, without success, contested service of process in this case by delivery at his St. Louis residence.

In 1916 he arrived in Reno, engaged a room and board at a hotel for which he paid $200 per month, and hired himself out to a furniture and carpet firm, who agreed to pay him $75 per month for his services, which Mr. Steinmetz, one of the firm, testified consisted in coming down at noon while the other employees were at dinner and answering the telephone and talking over the business. He says Mr. Steinmetz is his friend, and that is probably true. But the friend testified that he understood that respondent was there for a divorce.

He left Reno and Nevada a week or two after the decree was entered and returned to St. Louis, which he then testified was his home, and also testified that he had determined to take up his residence in Nevada in August, 1916, which was the very month in which his petition for divorce was filed.

The record is replete with evidence of this character, which not only proves but admits that in 1913 the respondent had made up his mind to get rid of his wife. This is so evident that it does not call for discussion of the incidents which tend to explain the origin of this determination. That he instituted the divorce suit against her under the impression that she would not fight is demonstrated by the subsequent course of the suit. When she filed her motion for alimony *pendente lite* he made the best bargain with her he could, but was careful to stipulate that she should leave the residence where they had passed many years of their married life. When she finally answered, his hope of controlling her vanished. He stopped paying her the stipulated sum of $125 per month, and determined to pursue his game in other fields. He found, either through outside informa-

tion or in the fertile ground of his own consciousness, that the dismissal of the suit would not put an end to his trouble, and his subsequent acts were all adjusted to the theory that she was in the right, and that his one chance of success in the scheme to get rid of her was to keep her too poor to fight, and to prostrate the process of the law to his purpose. She was needy and he was wealthy, and he negotiated with her necessity with such success that for the payment of $100 he secured her promise not to bring suit against him returnable to the term of the St. Louis Circuit Court which would begin in a couple of months.   He then immediately transferred all his properity to his mother and left the State, leaving the mother and her maid the only occupants of his residence, and it was to the maid that the process was delivered by the sheriff when service in this suit was obtained.   Being absent, the sheriff took up his cause, and having discovered that his mistake in entering the exact facts in his return amounted to service on his friend, he moved to amend, which privilege was denied.   There was then no time to lose and he started on the trip to expatriate himself.

It having been adjudged by the St. Louis Circuit Court that he had, while still a resident of Missouri, and an occupant of his own house, been properly served with process, the suit for separate maintenance proceeded to final judgment in appellant's favor upon the only ground authorized by the statute upon which it rested, wrongful abandonment by the respondent, with an express finding that appellant was the innocent and injured party.

That the respondent was ever domiciled in Nevada is too absurd for serious consideration.   The only evidence of the fact is his own statement that when he arrived there in January, 1916, he thought he would make it his home.   After remaining six months as the law required as a condition precedent to his suit for divorce, he filed his complaint for that purpose, and the proceeding so instituted proceeded with celerity to final decree, upon which he promptly left.   His citizenship began for the accom-

plishment of that purpose and ended with it. It applied to no other phase of respondent's life or activity than the act of which it constituted a part. One cannot be domiciled in two states at the same time, and if a Missourian should go to Nevada under a contract to work six months, his intention to return to his home or remain in Nevada would constitute the key to his citizenship.

With these facts before us we cannot become *particeps criminis* by ignoring their logical effect. They squarely present the question whether a citizen of Missouri may without cause, desert his wife, and without her knowledge or consent, go to a distant State the judicial process of which cannot run outside its limits, and procure a divorce in her absence which will *ipso facto* vacate a former judgment of our court in her favor adjudicating the same facts against him. There being no disputed facts within the limits of this proposition we have only to consider the law.

III.   At the outset we are impressed by the fact that this country, so far as it is necessary to consider the nature and extent of its powers and duties in this case, consists of a union of sovereign states, independent with respect to the making and execution of its own laws subject to the constitutional authority of the general government, which binds it together as one people. The jurisdiction of each state, subject to the limitation imposed by the Constitution, is absolute over all persons and things within its limits and is protected from legislative interference on the part of the nation or of its sister states by the Tenth Amendment to the Federal Constitution. To the extent only of its own sovereignty are the records of its judicial proceedings entitled to full faith and credit in other states. When its courts act outside their territorial jurisdiction, that is to say, upon persons and things having no existence within the limits of their process, their acts are without jurisdiction and void. To illustrate: One who holds a promissory note against a citizen of another state cannot, by publication or process from his own state, reach

*Matrimonial Status: Jurisdiction.*

the domicile of his foreign debtor and bring him constructively into a court of his own state and thereby obtain a judgment against him in his absence from the jurisdiction. In such case there is no jurisdiction of the person. On the other hand, if the debtor has property in the state of the creditor's domicile, the latter may attach it and thereby obtain jurisdiction, and a judgment against the thing attached, the debtor being at liberty to come into the court in defense of his property or not as he pleases.

The jurisdiction in divorce cases as between the states is equally plain and simple.

Although marriage, by statute in this State is considered a civil contract (R. S. 1909, sec. 8279), the matrimonial status itself is a matter of public concern, and amenable to the law of its domicile, and subject to legal control in that jurisdiction only. The person whose matrimonial status is to be affected must be in the jurisdiction where it exists. This place is called in law the matrimonial domicile of the person.

In this case the respondent, after his wife had been stripped of the means to follow him, left his home and state without disclosing to her his itinerary, and doubled upon his own track from resort to resort until he found the place where, without danger of being followed by his impecunious spouse, he could obtain a divorce with ease and dispatch. Can it be said in such a case that he takes with him the interest of his wife in the marriage status, so that he may subject it to the jurisdiction of any foreign court which he may find subservient to his purpose?

This evidently depends upon the place of her matrimonial domicile under the conditions so existing. The general rule is that the matrimonial domicile or place in which the matrimonial status of both parties has its abode is that of the husband. But, as is said by a distinguished author on The Conflict of Laws [1 Wharton (3 Ed.) sec. 224.]: ''In the United States, from our peculiar position as a confederation of independent sovereignties, contiguous, but each with its distinctive mu-

nicipal law of divorce, the difficulties of the rule soon became manifest. A man might give his wife cause for divorce and then defy her and defy the law, by putting it out of her power to avail herself of this cause. That which is an aggravation of the offense would become its shield. Deserting her, he might take up his home in a remote state, where she could only pursue him at great expense, encountering a jurisprudence selected by him as the most unfavorable to her claims. Or he might drive her, by his cruelty, to another state, compelling her, if she sue him, to sue as an alien, with the burdens attending one instituting proceedings in a foreign land. Or, what would be still more oppressive, he might steal a march on her and proceed to a jurisdiction with lax laws of divorce, and sue her in that jurisdiction, that being constructively her domicile, though within its bounds she had never set foot, and yet whose laws would be treated as binding her absolutely. So iniquitous is this, that in Massachusetts, in a celebrated case, it was ruled that for divorce purposes a woman can adopt her permanent residence as her domicile, and in this sue, or, if sued, set up its laws as those to which she is subject. This case. has been followed in most of the states of the American Union.''

It would be difficult to state the facts of this case in clearer language than that which the author has chosen to illustrate the wrongs which might flow from the rule which he shows no longer exists in American jurisprudence.

The question of jurisdiction is such cases, under the Federal Constitution, is subject to the final determination of the Supreme Court of the United States, and for that reason we call attention to the following adjudications of that tribunal upon the question.

In Barber v. Barber, 62 U. S. 582, 1. c. 594, that court said that ''when parties are already living under a judicial separation, the domicile of the wife does not follow that of the husband.'' In Harteau v. Harteau, 14 Pickering, 181, 185 (the case referred to in the above

quotation from Wharton), Chief Justice Shaw for the Supreme Judicial Court of Massachusetts, said: "But the law will recognize a wife, as having a separate existence, and separate interests, and separate rights, in those cases where the express object of all proceedings is to show, that the relation itself ought to be dissolved, or so modified as to establish separate interests, and especially a separate domicile and home." And in speaking of the separate domicile of the wife he said: "That after such right has accrued, it cannot be defeated, either by the actual absence of the other party, however long continued *animo revertendi,* or by a colorable change of domicile, or even by an actual change of domicile; and that it shall not be considered in law, that the change of domicile of the husband draws after it the domicile of the wife to another state, so as to oust the courts of this State of their jurisdiction, and deprive the injured wife of the protection of the laws of this commonwealth and of her right to a divorce."

In Haddock v. Haddock, 201 U. S. 563, l. c. 576, the Supreme Court of the United States through Mr. Justice White spoke to the very case we are now considering as follows:

"It is urged that the suit for divorce was a proceeding *in rem,* and, therefore, the Connecticut Court had complete jurisdiction to enter a decree as to the *res,* entitled to be enforced in the State of New York. But here again the argument is contradictory. It rests upon the theory that jurisdiction in Connecticut depended upon the domicile of the person there suing, and yet attributes to the decree resting upon the domicile of one of the parties alone a force and effect based upon the theory that a thing within the jurisdiction of Connecticut was the subject-matter of the controversy. But putting this contradiction aside, what, may we ask, was the *res* in Connecticut? Certainly it cannot in reason be said that it was the cause of action or the mere presence of the person of the plaintiff within the jurisdiction. The only possible theory then upon which the proposition proceeds

must be that the *res* in Connecticut, from which the jurisdiction is assumed to have arisen, was the marriage relation. But as the marriage was celebrated in New York between citizens of that State, it must be admitted, under the hypothesis stated, that before the husband deserted the wife in New York, the *res* was in New York and not in Connecticut. As the husband, after wrongfully abandoning the wife in New York never established a matrimonial domicile in Connecticut, it cannot be said that he took with him the marital relation from which he fled to Connecticut. Conceding, however, that he took with him to Connecticut so much of the marital relation as concerned his individual status, it cannot in reason be said that he did not leave in New York so much of the relation as pertained to the status of the wife. From any point of view, then, under the proposition referred to, if the marriage relation be treated as the *res,* it follows that it was divisible, and therefore was a *res* in the State of New York and one in the State of Connecticut. Thus considered, it is clear that the power of one State did not extend to affecting the thing situated in another State."

In Thompson v. Thompson, 226 U. S. 1. c. 562, the same court speaking through Mr. Justice Pitney with apparent approval of the Haddock case, and distinguishing it from the case in hand, said: "In the Haddock Case, the husband and wife were domiciled in New York, and the husband left her there and, after some years, acquired a domicile in Connecticut, and obtained in that State, and in accordance with its laws, a judgment of divorce, based upon constructive and not actual service of process on the wife, she having meanwhile retained her domicile in New York, and having made no appearance in the action. The wife afterwards sued for divorce in New York, and obtained personal service in that State upon the husband. The New York court refused to give credit to the Connecticut judgment, and this court held that there was no violation of the full faith and credit clause in the refusal, and this because there was not at

any time a matrimonial domicile in the State of Connecticut, and therefore the *res*—the marriage status—was not within the sweep of the judicial power of that State."

In Parker v. Parker, 222 Fed. l. c. 191, the United States Circuit Court of Appeals for the Fifth Circuit said: "The obligatory recognition of such a decree beyond the limits of the state depends, however, upon whether there was jurisdiction of the matrimonial relation of the parties. That relation may not follow the domicile, of the offending husband. If the adopted residence is intended to perpetrate a fraud on the innocent wife, or if the wife is without fault, and was deserted, the matrimonial domicile remains in the state of her residence. The law is well settled on this subject in Barber v. Barber, supra." It also quotes with approval from Barber v. Barber, supra, as follows: "Where the domicile of matrimony is in a particular state, and the husband, abandoning the wife, wrongfully goes into another state in order to avoid his marital obligation, such other state does not become a new domicile of matrimony, nor the actual or constructive domicile of the wife. That (the matrimonial domicile and that of the wife) continues in the original state until she actually acquires a new one."

In this case the wife was residing in Missouri, under judicial decree obtained against her husband upon personal service. That decree fixed her matrimonial status separately from him.

The question here is whether he can put this separate matrimonial status adjudged to his wife into his own pocket, and carry it to Nevada, and there use it to give jurisdiction to a court of that state to set aside the judgment of the Missouri court which fixes it. This absurd proposition is answered definitely by the court which is the final arbiter in the matter, and we see nothing in the cases cited by respondent to the contrary. They all proceed upon the well-established theory that ordinarily the matrimonial domicile of the wife follows that of the husband. This is true, for there can be but one such domi-

cile while it is her duty to live with him. They are matrimonially one person, and, as such, can have but one abiding place. When that unity is destroyed by a decree of court founded upon the misconduct of the husband, or is wrongfully repudiated by him, the law permits her to get bread and the shelter of a home without surrendering her matrimonial right.

This doctrine covers completely the facts of this case and if any court has inadvertently disregarded it we need not follow it into the error. It follows that the Nevada court having no jurisdiction of the *res*— the subject-matter of this suit—its decree, whatever may be its effect on the rights and duties of the respondent is void in all things relating to the matrimonial status of the appellant, inclusive of the judgment of the St. Louis Circuit Court which established her innocence of wrong in the matrimonial relation and her desertion by respondent together with her right to be his wife wherever she might lawfully be. This is for her the *situs matrimonii*.

IV. That the Nevada court was induced by actual fraud to assume jurisdiction is evident. That respondent dismissed his divorce suit in Missouri for the purpose of seeking a more kindly jurisdiction is shown by his subsequent movements which converted this intention into an accomplished fact. In this he contemplated the legal effect of his action as vacating the order for alimony *pendente lite* so as to leave her without funds to follow him. He then took advantage of her impecunious condition to induce her, for $100, to delay further proceedings for her support while he should escape from the jurisdiction. She scrupulously performed her part of this agreement, but he failed to escape because when he crossed the river he left his mother and her maid who constituted his entire family, behind him in the family domicile. When he finally drifted into Reno, the haven of his hopes, he prepared himself for judicial welcome by engaging board for two hundred dollars per month and hiring out for seventy-

*Fraud Upon Court.*

five dollars per month. The presence of his own marriage status being jurisdictional, fraud, in that respect, would go to the very foundation of the jurisdiction of the court.

It is, as we have seen, unnecessary to consider to what extent he might be estopped from availing himself of his own fraud to deny the validity of the judgment. The question is not before us.

Nor will we uselessly discuss or determine whether or not an action will lie in a foreign state to dissolve the bonds of matrimony between the parties for acts done by the defendant while they were living and cohabiting together and domiciled in this State; which were no cause for divorce under our laws. Although the record before us presents this question, it is unnecessary, in view of what we have already said, to consider.

For the reasons stated in this opinion the judgment of the St. Louis Circuit Court vacating the order for separate maintenance is reversed. *Ragland* and *Small, CC.,* concur.

PER CURIAM:—The foregoing opinion by Brown, C., is adopted as the opinion of the court. All the judges concur, *Goode J.,* in the result.